# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Target Device, currently located at 4725 W. Electric Ave., Milwaukee, Wisconsin 53219, more fully described in Attachment A

Case No. 26-850M(NJ)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warranton or before 2/12/2026 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Nancy Joseph.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ____________.

Date and time issued: 1/29/2026

*Judge's signature*

City and state: Milwaukee, Wisconsin

Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| --- | --- | --- |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

______________________________
*Executing officer's signature*

______________________________
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

The property to be searched is the cellphone seized from Demetrius PARKS on January 20, 2026, after he was arrested by the United States Marshals Service, more fully described as the following, hereinafter referred as the "**Target Device**": a black Apple iPhone in a black case (see *Figures 1* and *2*).



*Figure 1*



*Figure 2*

The **Target Device** is currently located at the DEA Milwaukee District Office, 4725 W. Electric Ave., Milwaukee, Wisconsin 53219.

The applied-for warrant would authorize the forensic examination of the **Target Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

1. All records on the **Target Device** described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) (Possession with Intent to Distribute a Controlled Substance), 843(b) (Use of a Communication Facility to Facilitate the Distribution of a Controlled Substance), and 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance) involving Demetrius PARKS, Alexis SALAZAR-Garcia, and other individuals identified and not identified, including:

a. Preparatory steps taken in furtherance of this crime;

b. Any audio, video, and/or photograph(s) files on the phone of the above criminal activity or of evidentiary value;

c. All voicemail and call records;

d. All text messages and call history;

e. Contact list, to include names, addresses, phone numbers, and/or email addresses;

f. All social media sites used and applications for social media sites;

g. Lists of customers and related identifying information;

h. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

i. Types, quantities, and prices of firearms possessed;

j. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information); and,

k. All bank records, checks, credit card bills, account information, and other financial records.

l. All internet activity; and

m. All location data including from the phone and/or from any downloaded applications.

2. Evidence of user attribution showing who used or owned the **Target Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

a. records of Internet Protocol addresses used; and

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data), any photographic form, and/or any memory card or other data storage device within or connected to the **Target Device**.

5. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Target Device, currently located at 4725 W. Electric Ave., Milwaukee, Wisconsin 53219, more fully described in Attachment A

Case No. 26-850M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1)<br>21 U.S.C. § 843(b)<br>21 U.S.C. § 846 | Distribution of a controlled substance; use of a communications facility to facilitate the distribution of a controlled substance; and conspiracy to distribute a controlled substance. |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

MATTHEW KILBY Digitally signed by MATTHEW KILBY Date: 2026.01.27 11:36:05 -06'00'

*Applicant's signature*

Matthew Kilby, DEA Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 1/29/2026

*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Matthew Kilby, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, an electronic device, which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent (SA) with the Drug Enforcement Administration (DEA). I have been so employed since October 2019 and have been assigned to the DEA Milwaukee District Office since December 2023. Between October 2019 and December 2019, I was assigned to the DEA Milwaukee District Office. Between December 2019 and October 2022, I was assigned to the DEA El Paso Division Office in El Paso, Texas. Between October 2022 and December 2023, I was assigned to the DEA Las Cruces District Office in Las Cruces, New Mexico. As part of my duties as a DEA Special Agent, I investigate criminal violations relating to drug trafficking and money laundering offenses, including criminal violations of Federal Controlled Substance laws, including, but not limited to, Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. As a result, my investigative experience includes, but is not limited to, physical and electronic surveillance, debriefing of defendants, informants, witnesses, and others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

3. I have participated in complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. More specifically, my training and experience includes the following:

a. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States, including importing controlled substances from other countries, like Mexico;

b. I have experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

c. I am familiar with the appearance and street names of various drugs, including but not limited to, fentanyl, marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of various controlled substances;

d. I am familiar with the language utilized over the telephone and social media to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

e. I am familiar with drug traffickers' employment of counter surveillance, their use of false or fictitious identities, and their use of various forms of electronic devices to store and/or conceal illegal activity;

f. I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations. Drug traffickers will communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging applications, and social media;

g. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

h. I know drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business. I know it is common for persons involved in large-scale drug trafficking and related crimes to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as drug ledgers, currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. Because narcotics trafficking generates large sums of cash, it requires the keeping of detailed records as to the distribution of narcotics as well as the laundering of the proceeds. Such records also typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the narcotics proceeds on behalf of the organization. These records, unlike controlled substances, are often maintained for long periods, even several years. These items are maintained by the traffickers within residences, vehicles, or other locations over which they maintain dominion and control;

i. I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledger, etc., are maintained where the traffickers have immediate access to them, including their residences;

j. It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence;

k. It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices;

l. Likewise, it is common for businesses who engage in transactions with individuals involved in criminal activity to conceal the nature of the transactions through false records such as invoices, by maintaining false financial records, or placing the transaction in a nominee name. These businesses may need to keep these false records for inventory or bookkeeping reasons. However, these false records may be placed in a separate location such as a personal residence, safe, or safe deposit box for concealment;

m. I know drug traffickers often use electronic equipment such as telephones (landlines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

n. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering and structuring activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency;

o. I know that the Currency Transaction Report (CTR) (Fincen Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000, causes tremendous problems with drug traffickers when they attempt to negotiate their illegal profits at a financial institution; I further know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

p. I know drug traffickers commonly maintain addresses or telephones numbers in books or papers or through social media accounts, which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization(s);

q. I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers, including the use of different social media like Instagram and Facebook, and by those engaged in money laundering and structuring activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, zip disks, flash memory cards, smart media, and any

data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices;

r. Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or related financial crimes; computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular/wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data;

s. I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking; and

t. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, handbags, and jewelry. I know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement.

4. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also obtained multiple search warrants and conducted subsequent analysis of social media accounts of those engaged in criminal conduct, including drug trafficking. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence,

including items from social media accounts, has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

5. The statements contained in this affidavit are based on information derived from my personal knowledge, training and experience; information obtained from the knowledge and observations of other sworn law enforcement officers, either directly or indirectly through their reports or affidavits; surveillance conducted by law enforcement officers; information provided by a confidential informant; analysis of public records; controlled purchases of drugs; analysis of social media information; analysis of telephone records; and analysis of financial records. Throughout this affidavit, reference will be made to "case agents". Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

6. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute a controlled substance), 843(b) (use of a communication facility to facilitate the distribution of a controlled substance), and 846 (conspiracy to possess with intent to distribute a controlled substance) have been committed, are being committed, and will be committed by Demetrius PARKS and other identified and unidentified subjects. There is also

probable cause to search the device described in Attachment A for evidence of these crimes further described in Attachment B.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

8. The property to be searched was recovered from Demetrius PARKS on January 20, 2026, following his arrest by the United States Marshals Service, more fully described as the following, hereinafter referred as the "**Target Device**": a black Apple iPhone in a black case (see *Figures 1* and *2*).



*Figure 1*



*Figure 2*

9. The **Target Device** is currently located at the DEA Milwaukee District Office, 4725 W. Electric Ave., Milwaukee, Wisconsin 53219.

10. The applied-for warrant would authorize the forensic examination of the **Target Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

### A. Background

11. Since October 2025, the Drug Enforcement Administration (DEA) has been conducting an investigation involving Alexis SALAZAR-Garcia, Jaylen ALLEN, Timothy WILLIAMS, Jr., Demetrius PARKS, and other known and unknown individuals, who are believed to be members of a Milwaukee-area based Drug Trafficking Organization (DTO) engaged in the distribution of fentanyl pills.

12. In October 2025, DEA Milwaukee received information and a request for support from members of the Lake Winnebago Area Metropolitan Enforcement Group (LWAM). At that time, LWAM personnel stated that they had a Confidential Informant (CI) who could purchase fentanyl pills from unidentified targets in the Milwaukee, Wisconsin area. Since late October 2025, the CI has communicated with targets under this investigation via a Facebook Profile bearing the name "Jaylen Allen" and a URL of https://www.facebook.com/jaylen.allen.180, a telephone number 414-255-6012, a second Facebook account bearing the name "DJ Chandler (Leftpocket DJ)" and a URL of https://www.facebook.com/TheRealShakeBackKing, and a telephone number 262-217-4782. To date, the CI has predominantly communicated with the user of the "DJ Chandler" Facebook account via Facebook Messenger. Case agents are aware that Jaylen ALLEN

is currently incarcerated after being arrested by DEA Green Bay for conspiracy to possess with intent to distribute fentanyl.

13. The CI's information is credible and reliable because the CI has given information concerning individuals involved in illegal activities. The CI's information has been independently verified through this investigation, including through controlled drug buys involving the CI as detailed below, queries of law enforcement databases, and surveillance. The CI has made statements against his/her penal interests. According to the Circuit Court of Wisconsin, the CI has one felony conviction for retail theft. The CI is cooperating with law enforcement for judicial consideration in connection with a pending drug case. For these reasons, your affiant believes that the CI is credible, and that his/her information is reliable.

14. On November 19, 2025, the CI contacted the target via the "DJ Chandler" Facebook account and asked if the user of that account would be willing to meet on November 20, 2025, at approximately 12:00 PM or 1:00 PM, to which the user of the "DJ Chandler" Facebook account agreed. On the same date, the CI texted 262-217-4782 and asked what time the CI could meet the user of 262-217-4782 on November 20, 2025, to which the user of the telephone number stated, "Yeah just call text me when u ready then I'm send address".

15. On November 20, 2025, at approximately 12:45 PM, case agents met with the CI at the DEA Milwaukee District Office (MDO). At that time, the CI and the CI's vehicle were searched, and no contraband was found.

16. On the same date, the CI contacted the target on Facebook Messenger via the "DJ Chandler" Facebook account. During that conversation, the CI asked the user of the "DJ Chandler"

Facebook account for an address where they could conduct their fentanyl pill transaction and the user of the “DJ Chandler” Facebook account sent "1407 N MLK" and later stated "Ik that's my house my loft". Case agents know this address to be 1407 N. Doctor M.L.K. Jr. Drive, Milwaukee, Wisconsin. At that time, case agents established surveillance in the area.

17. At approximately 1:30 PM, case agents outfitted the CI and the CI's vehicle with audio and video recording/monitoring devices and followed the CI to 1407 N. Doctor M.L.K. Jr. Drive, maintaining constant visual contact with the CI's vehicle.

18. At approximately 1:50 PM, case agents observed the CI's vehicle park on the street near 1407 N. Doctor M.L.K. Jr. Drive.

19. At approximately 1:55 PM, the target contacted the CI via the “DJ Chandler” Facebook account and advised that he was putting everything in a bag for the CI.

20. At approximately 1:58 PM, case agents, monitoring the CI via the CI's outfitted monitoring device, observed the CI receive a phone call from the target. During that phone call, the target requested that the CI video call the target so that the target could provide the CI with driving instructions to the meet location.

21. At approximately 1:59 PM, case agents observed the target, via the CI's outfitted monitoring device, direct the CI to drive into the alley between W. Vliet Street and W. McKinley Avenue and park near a white Honda vehicle that was parked in the alley.

22. At approximately 2:00 PM, case agents observed the CI park near the white Honda vehicle in the alley.

23. At approximately 2:05 PM, case agents observed a black male wearing a grey hooded sweatshirt with the hood up and light-colored jeans enter the CI vehicle's passenger seat while talking on the phone. At that time, case agents observed, via the CI's monitoring equipment, the male remove a knotted plastic bag containing blue pills from his pants pocket and hand it to the CI with his right hand. Case agents then observed the CI ask the target if there were one hundred pills in the baggie, to which the target responded in the affirmative. At that time, case agents observed the CI hand the target $400.00 in DEA Official Advanced Funds (OAF). Case agents then observed the target count the money.

24. At approximately 2:06 PM, case agents observed the target exit the CI's vehicle and walk to the southeast corner of the building located at 1300 N. Vel R. Phillips Avenue and enter the door located on that corner of the building. At that time, surveillance was terminated.

25. At the same time, case agents observed the CI's vehicle exit the area. Case agents maintained constant visual surveillance on the CI's vehicle until it returned to the DEA MDO at approximately 2:22 PM. At that time, case agents took custody of the above pills from the CI and searched the CI and the CI's vehicle for any additional contraband, none was located.

26. On December 1, 2025, case agents reviewed the video footage captured by the CI's recording device during the above-referenced transaction and were able to compare the individual seen in the video to Wisconsin Department of Corrections and Milwaukee County Jail booking photos of Jaylen ALLEN's suspected conspirators who DEA Green Bay investigators identified during the course of their investigation into ALLEN. As a result, case agents were able to positively identify the male who conducted the drug transaction with the CI as Timothy WILLIAMS, Jr.

27. On January 12, 2026, case agents received laboratory results from the DEA North Central Laboratory regarding the pills purchased from WILLIAMS on November 20, 2025. According to the DEA North Central Laboratory, the pills tested positive for fentanyl, with a net weight of approximately 11.1 grams.

28. Between the November 20, 2025, drug transaction and December 8, 2025, the CI maintained contact with the user of the "DJ Chandler" Facebook account. During their conversations, the user of the "DJ Chandler" Facebook account confirmed that they were willing to sell the CI 1,000 fentanyl pills for $3.00 per pill. The user of the "DJ Chandler" Facebook account also advised that they had received some "different ones" that are "... just smaller and light from the ones u got but they like both of them". In these messages, case agents believe that the user of the "DJ Chandler" Facebook account was telling the CI that the user of the "DJ Chandler" Facebook account received a new batch of fentanyl pills that were smaller and lighter in color than the ones the CI purchased on November 20, 2025, and that the "DJ Chandler" Facebook account user's other customers liked the new pills as well. During their conversation, the user of the "DJ Chandler" Facebook account agreed to sell the CI 1,000 pills at the "same spot", referring to the alley outside the apartment building located at 1300 N. Vel R. Phillips Avenue, Milwaukee, Wisconsin, the site of the transaction that occurred between WILLIAMS and the CI on November 20, 2025.

29. On December 8, 2025, at approximately 10:52 AM, case agents met with the CI at the DEA Milwaukee District Office (MDO). At that time, the CI and the CI's vehicle were searched, and no contraband was found.

30. On the same date, case agents established surveillance in the area of 1300 N. Vel R. Phillips Avenue, in anticipation of the transaction between the CI and the user of the "DJ Chandler" Facebook account.

31. At approximately 11:08 AM, DEA personnel outfitted the CI and the CI's vehicle with an audio and video recording/monitoring device. However, shortly after the initialization of the audio and video recording/monitoring device, the device malfunctioned and only recorded and broadcasted audio of the following events.

32. At approximately 11:10 AM, case agents followed the CI to the area of 1300 N. Vel R. Phillips Avenue, maintaining constant visual contact with the CI's vehicle.

33. At approximately 11:24 AM, DEA personnel observed the CI park on N. Doctor M.L.K. Jr. Drive, near 1300 N. Vel R. Phillips Avenue.

34. At approximately 11:26 AM, DEA personnel, via the audio from the CI's monitoring device, heard the CI call the user of the "DJ Chandler" Facebook account on Facebook Messenger and advise him that the CI was parked in front of the building.

35. At approximately 11:35 AM, case agents, via the audio from the CI's monitoring device, heard the CI receive a call from the user of the "DJ Chandler" Facebook account, stating that he was in the elevator heading down to meet with the CI.

36. At approximately 11:43 AM, case agents, via the audio from the CI's monitoring device, heard the user of the "DJ Chandler" Facebook account call the CI and advise the CI to drive into the alley located outside of 1300 N. Vel R. Phillips Avenue.

37. At approximately 11:45 AM, case agents observed the CI's vehicle drive into the alley and park outside of 1300 N. Vel R. Phillips Avenue, next to a black Mercedes-Benz C300 bearing Wisconsin license plates AVK-2503.

38. At approximately 11:48 AM, case agents observed the Mercedes-Benz drive south in the alley and park again, near the mouth of the alley at West McKinley Avenue. At that time, case agents observed a black male, later identified through Milwaukee Police Department booking photos as Demetrius PARKS, wearing a grey t-shirt and light-wash blue jeans, exit the southeastern door of 1300 N. Vel R. Phillips Avenue and approach the CI's vehicle on the driver's side.

39. At approximately 11:49 AM, case agents observed PARKS walk to the Mercedes-Benz and enter the front passenger seat. Shortly after, case agents observed PARKS exit the Mercedes-Benz and return to the CI's vehicle before entering the front passenger seat of the CI's vehicle. At that time, case agents, via the audio from the CI's monitoring device, heard PARKS and the CI conduct the drug transaction. During the transaction, case agents, via the audio from the CI's monitoring device, heard PARKS ask the CI if the CI was giving him $3,000.00, to which the CI responded in the affirmative. Moments later, case agents observed PARKS exit the passenger side of the CI's vehicle and return to the door that he had previously exited, located on the southeastern corner of 1300 N. Vel R. Phillips Avenue.

40. At 11:50 AM, case agents observed the CI's vehicle exit the area. At that time, case agents followed the CI's vehicle back to the DEA MDO. During that time, case agents maintained

constant visual surveillance on the CI's vehicle until it returned to the DEA MDO at approximately 12:03 PM.

41. Upon arrival at the MDO, case agents took custody of the pills from the CI and searched the CI and the CI's vehicle for any additional contraband, none was located. At that time, case agents debriefed the CI regarding the above transaction. During the debrief, the CI stated that the male that sold the CI the suspected fentanyl pills (whom case agents know as PARKS) met with a Hispanic male with a moustache, in the Mercedes-Benz, prior to selling the CI the suspected fentanyl pills. After this transaction, the user of the "DJ Chandler" Facebook account told the CI that the Hispanic male was "my guy", implying that the Hispanic male was his source of supply for the suspected fentanyl pills.

42. On the same date, case agents processed the suspected fentanyl pills as DEA evidence. At that time, case agents weighed the suspected fentanyl pills and obtained a gross weight of approximately 133.5 grams. On the same date, case agents mailed the suspected fentanyl pills to the DEA North Central Laboratory. Case agents are still awaiting laboratory results for the suspected fentanyl pills.

43. On the same date, case agents queried the Mercedes-Benz's license plates through the Wisconsin Department of Motor Vehicles (DMV). As a result, case agents learned that the Mercedes-Benz is registered to Francisco Salazar and Maria Garcia Hernandez at 2148 South 19th Street, Milwaukee, Wisconsin.

44. On December 10, 2025, case agents queried the Mercedes-Benz's license plates in a commercial license plate reader (LPR) system. As a result, case agents received results that

showed the Mercedes-Benz frequently parked overnight in the area of 1229 South 64th Street in West Allis, Wisconsin.

45. On December 11, 2025, case agents conducted surveillance in the area of 1229 South 64th Street. At that time, case agents observed the Mercedes-Benz parked in the alley, on a parking slab, closest to the rear garage of 1219 S. 64th Street, West Allis, Wisconsin. This parking position is consistent with the LPR images that were received by case agents.

46. On the same date, case agents queried the Mercedes-Benz and its registered owners in law enforcement databases. As a result, case agents learned that Salazar has a son named Alexis SALAZAR-Garcia. At that time, a booking photo of SALAZAR-Garcia from Wisconsin Department of Corrections was located and shown to the CI. Subsequently, the CI positively identified the male in the photo (SALAZAR-Garcia) as the individual who the CI saw PARKS meet with on December 8, 2025, prior to PARKS selling suspected fentanyl pills to the CI. Additionally, case agents observed that the photo of SALAZAR-Garcia matched the description provided by the CI on December 8, 2025, because SALAZAR-Garcia is a Hispanic male with a moustache. Case agents also observed that, in law enforcement databases, SALAZAR-Garcia is linked to 2148 South 19th Street, Milwaukee, Wisconsin, the registered address of the Mercedes-Benz, as recently as August 2025. Upon further investigation, case agents also observed that in 2021, a law enforcement database listed SALAZAR-Garcia as the driver of a Mercedes-Benz matching the same make, model, color, and Vehicle Identification Number (VIN) WDDGF8BB8BR175076 as the above Mercedes-Benz.

47. On December 16, 2025, case agents queried 1219 South 64th Street through West Allis Police Department systems. At that time, case agents learned that, in 2024, SALAZAR-Garcia contacted emergency dispatchers within the City of West Allis and requested that emergency services be sent to his location, 1219 South 64th Street, because he was with someone who was having a medical issue.

48. On the same date, case agents contacted personnel from Milwaukee Enrollment Services (MES) for the State of Wisconsin's FoodShare program and asked for available information related to SALAZAR-Garcia. At that time, MES personnel advised that SALAZAR-Garcia has previously provided them with an address of 2148 South 19th Street, Milwaukee, Wisconsin and a phone number of 414-916-5259. On the same date, case agents queried the phone number through the CashApp Application and observed that the telephone number is linked to a CashApp account with the name "Alexis Salazar" and a username of $lexG1222S. Additionally, upon observing the CashApp profile, case agents observed a profile picture that contained a Hispanic male, matching SALAZAR-Garcia's physical description, pointing what appears to be an assault-style rifle with a green laser on it at the camera. Subsequently, case agents queried the telephone number through law enforcement databases and observed that it is connected to SALAZAR-Garcia.

49. As a result, case agents believe that, on December 8, 2025, SALAZAR-Garcia operated the Mercedes-Benz and delivered approximately 133.5 grams of suspected fentanyl pills to PARKS, who then sold them to the CI.

50. On January 20, 2026, PARKS was arrested at 2100 W. Pierce Street, Apartment 219 in Milwaukee, Wisconsin, by the United States Marshals Service (USMS) for multiple outstanding warrants. At that time, Lenaesha Williams was also located in the apartment and was identified as the listed resident of the apartment. Subsequently, Williams provided case agents with written consent to search the apartment and her cellular telephone. As a result, case agents searched the apartment and seized two handguns, a rifle, and numerous rounds of firearm ammunition in multiple calibers, spread throughout the apartment. PARKS is a convicted felon. Additionally, during the search, case agents located and seized a cellular telephone (**Target Device**) belonging to PARKS. Upon locating the **Target Device**, case agents asked Williams to whom the **Target Device** belonged. At that time, Williams stated that it belonged to PARKS and provided the phone number for the **Target Device** as 414-639-5037.

51. On the same date, case agents transported the **Target Device** to the DEA MDO and secured it in an evidence storage locker for safekeeping.

52. The **Target Device** is currently in the lawful possession of the DEA Milwaukee District Office in Milwaukee, Wisconsin. In my training and experience, I know that the **Target Device** has been stored in a way that its contents are, to the extent material to this investigation, in substantially the same state as they were when the **Target Device** first came into the possession of Milwaukee DEA.

53. Case agents believe that PARKS used the **Target Device** to access the "DJ Chandler" Facebook account and to facilitate drug trafficking activities, in coordination with SALAZAR-Garcia and evidence of drug trafficking may likely be stored and recorded on the

**Target Device**. Case agents believe that the **Target Device** contains valuable information that could be used as evidence for the possible crimes of distribution and possession with intent to distribute controlled substances, and conspiracy to distribute and possess with the intent to distribute controlled substances, violations of Title 21, United States Code, Sections 841 and 846.

54. Through my training, experience, and discussions with other experienced law enforcement officers, I am familiar with the ways in which drug traffickers conduct their unlawful trade, including their methods of distribution, their use of communication devices, their use of coded communications to conduct their transactions, the employment of counter surveillance, their use of false or fictitious identities, and their use of various forms of electronic devices to store and/or conceal illegal activity.

55. Based upon my training and experience, I know that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources, customers, and co-conspirators in the distribution of controlled substances. I have also found it very common for crime suspects to use their cellular telephones to communicate orally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs.

56. Based on my training and experience, the affiant is aware that individuals involved in the trafficking of controlled substances often possess multiple cellular devices to compartmentalize their illegal activity and to avoid law enforcement detection.

57. Based upon my training and experience, the affiant believes it is common for suspects who possess illegal controlled substances to often take or cause to be taken photographs

and other visual depictions of themselves, their associates, and the illegal controlled substances and proceeds of drug trafficking. Furthermore, the affiant believes it is common for these photographs and visual depictions to be kept and maintained on their cellular devices.

**TECHNICAL TERMS**

58. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Cellular telephone: A cellular telephone is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved

in such navigation. The Global Positioning System (GPS) consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system (GPS) technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (IP address) is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

59. Based on my training, experience, and research, I know that the **Target Device** has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and all can access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FROENSIC ANALYSIS**

60. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some time on the device. This information can sometimes be recovered with forensics tools.

61. As explained below, information stored within a cellular phone (cell phone) may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contact lists, instant messaging logs, and

communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner. Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (e.g., location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information on the cell phone may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or overwrites the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

62. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Target Device** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

63. *Manner of Execution*. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

64. Based on the above information provided in this affidavit, I believe there is probable cause that the **Target Device** contains evidence of violations of Title 21, United States Code, Sections 841(a)(1) (Possession with Intent to Distribute a Controlled Substance) and 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance), involving Demetrius PARKS, Alexis SALAZAR-Garcia, and other individuals identified and not identified.

## ATTACHMENT A

**Property to Be Searched**

The property to be searched is the cellphone seized from Demetrius PARKS on January 20, 2026, after he was arrested by the United States Marshals Service, more fully described as the following, hereinafter referred as the "**Target Device**": a black Apple iPhone in a black case (see *Figures 1* and *2*).



*Figure 1*



*Figure 2*

The **Target Device** is currently located at the DEA Milwaukee District Office, 4725 W. Electric Ave., Milwaukee, Wisconsin 53219.

The applied-for warrant would authorize the forensic examination of the **Target Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

1. All records on the **Target Device** described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) (Possession with Intent to Distribute a Controlled Substance), 843(b) (Use of a Communication Facility to Facilitate the Distribution of a Controlled Substance), and 846 (Conspiracy to Possess with Intent to Distribute a Controlled Substance) involving Demetrius PARKS, Alexis SALAZAR-Garcia, and other individuals identified and not identified, including:

a. Preparatory steps taken in furtherance of this crime;
b. Any audio, video, and/or photograph(s) files on the phone of the above criminal activity or of evidentiary value;
c. All voicemail and call records;
d. All text messages and call history;
e. Contact list, to include names, addresses, phone numbers, and/or email addresses;
f. All social media sites used and applications for social media sites;
g. Lists of customers and related identifying information;
h. Types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;
i. Types, quantities, and prices of firearms possessed;
j. Any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information); and,
k. All bank records, checks, credit card bills, account information, and other financial records.
l. All internet activity; and
m. All location data including from the phone and/or from any downloaded applications.

2. Evidence of user attribution showing who used or owned the **Target Device** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3. Records evidencing the use of the Internet Protocol address to communicate with using the internet including:

a. records of Internet Protocol addresses used; and

b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data), any photographic form, and/or any memory card or other data storage device within or connected to the **Target Device**.

5. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.